UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BODY GLOVE IP HOLDINGS, LP,

                      Plaintiff,

        -against-

EXIST, INC. AND JOSHUA GLICKMAN,

                      Defendants.

Case No. 1:21-cv-01181 (JLR)

**REDACTED**
**OPINION & ORDER**

JENNIFER L. ROCHON, United States District Judge:

      Plaintiff Body Glove IP Holdings, LP ("Body Glove" or "Plaintiff"), a Delaware limited partnership based in New York, brings this action against Exist, Inc. ("Exist"), a Florida corporation, and the President of Exist, Joshua Glickman ("Glickman" and, together with Exist, "Defendants"), alleging claims arising out of a licensing agreement which permitted Exist to sell products under Body Glove's registered trademark.  ECF No. 1 ("Compl."); ECF No. 6 ("Ans."). Now before the Court are the parties' cross-motions for summary judgment on Body Glove's claims for breach of contract (as to Exist) and breach of personal guaranty (as to Glickman), Defendants' affirmative defenses, Defendants' counterclaims for breach of contract and breach of the covenant of good faith and fair dealing, and Body Glove's affirmative defenses.  For the reasons set forth below, Body Glove's motion is GRANTED, and Defendants' motion is DENIED.

## BACKGROUND

      Unless otherwise noted, the following facts are undisputed.[1]

---

[1] In support of their motion for summary judgment, Body Glove submitted the following:  a memorandum of law in support of its motion (ECF No. 39 or "Pl. Br."); a statement of undisputed facts pursuant to Local Rule 56.1 (ECF No. 38 or "Pl. 56.1 Statement"); and an Affirmation of Yasin Daneshfar in Support (ECF No. 38-1 or "Daneshfar Supp. Decl.") with

## I.    The May 2017 License Agreement

On May 9, 2017, Plaintiff Body Glove and Defendant Exist entered into an agreement under which Body Glove licensed its trademark "BODY GLOVE" (the "Mark") to Exist to use "on certain products, in specified territories, to specified customers, and in specified channels of distribution."  Pl. 56.1 Counter ¶¶ 1-5; *see also* ECF No. 38-3 (the "License Agreement" or "Agreement") §§ 1-7, 23(1) (warranting that Body Glove is owner of trademark)).  Specifically, pursuant to the Agreement, Body Glove granted Exist "the exclusive right to use" the Mark "solely in connection with the manufacture, distribution and sale of Products in the Territory to Approved Customers in the Channels of Distribution (as defined below) during the Term . . . ." License Agreement § 4.  The Agreement defined several of these terms.  The initial Term of the Agreement was from its execution through December 31, 2019.  *Id.* § 7; *see also* Pl. 56.1

---

attached exhibits (ECF Nos. 38-2 through 38-13) in redacted form.  Body Glove also submitted the Affirmation of Yasin Daneshfar and certain exhibits under seal.  *See* ECF No. 41.  In opposition to Body Glove's motion, Defendants submitted the following:  a memorandum of law in opposition in redacted form (ECF No. 45 or "Def. Opp."); a counterstatement to Body Glove's Rule 56.1 Statement (ECF No. 45-1 or "Def. 56.1 Counter"); and an Affirmation of Brian L. Grossman in Opposition (ECF No. 45-2 or "Grossman Opp. Decl.") with attached exhibits (ECF Nos. 45-3, 45-4, and 45-5).  Defendants also submitted its brief in opposition under seal.  *See* ECF No. 46-1.  Plaintiff Body Glove further submitted a brief in reply (ECF No. 59 or "Pl. Reply") and a response to Defendants' Rule 56.1 Counterstatement (ECF No. 57 or "Pl. 56.1 Reply").

In support of Defendants' motion, Defendants submitted the following:  a memorandum of law in support of their motion (ECF No. 35 or "Def. Br."); a statement of undisputed facts pursuant to Local Rule 56.1 (ECF No. 35-1 or "Def. 56.1 Statement"); and an Affirmation of Brian L Grossman in Support (ECF No. 35-2 or "Grossman Supp. Decl.") with attached exhibits (ECF Nos. 35-3 through 35-22) in redacted form.  Defendants also submitted several of those exhibits under seal.  *See* ECF No. 37.  In opposition to Defendants' motion, Plaintiff Body Glove submitted the following:  a memorandum of law in opposition in redacted form (ECF No. 50 or "Pl. Opp."); a counterstatement to Defendants' Rule 56.1 statement in redacted form (ECF No. 47 or "Pl. 56.1 Counter"); an Affirmation of Yasin Daneshfar in Opposition (ECF No. 47-1 or "Daneshfar Opp. Decl.") and attached exhibits (ECF Nos. 47-2 through 47-7) in redacted form.  Plaintiff Body Glove also submitted versions of these submissions under seal.  *See* ECF No. 51.  Defendants further submitted a brief in reply.  *See* ECF No. 55 ("Def. Reply").

Counter ¶ 11 (noting that the first year of the contract ended December 31, 2018, and the second year ended December 31, 2019); *id.* ¶ 12 (noting that the Agreement provided for a three-year renewal term if the parties so agreed).  The Products included:  "(1) men's sportswear, activewear, resortwear, and baseball hats; and (2) women's sportswear and resortwear including dresses and baseball hats (which may include co-branded products) that in each case bear the Licensed Property . . . ."  License Agreement § 2.  The Territory included the United States, Mexico, Canada, and the Caribbean Islands.  *Id.* § 3.  The Agreement defined Approved Customers as "any retail store (and such stores' e-commerce platform) that sells in the Channels of Distribution . . . ."  *Id.* § 5.  It defined the Channels of Distribution as "[r]esort retailers," which included "chains and independent stores and the e-commerce based websites of those resort retailers."  *Id.* § 6.  "Resort retailers" are generally understood within the industry, according to the parties, as "stores at any tourist destinations or a resort itself."  Pl. 56.1 Counter ¶ 10.

The Agreement further provided that, each contract year, Exist would be required to hit a "Minimum Net Sales" amount; in the first year, Exist agreed to $3,000,000 in net sales, and in the second year, Exist agreed to $4,500,000 in net sales.  License Agreement § 10.  These numbers represented the minimum amount that Exist "can do within the rights that they were granted" under the Agreement.  Pl. 56.1 Counter ¶¶ 16-17 (internal emphasis and brackets omitted).  The parties further agreed that Exist would pay Body Glove a six percent royalty rate on its net sales of products under the Agreement.  License Agreement § 12; *see* Pl. 56.1 Counter ¶ 18.  For each year, Exist agreed to pay the greater of the royalty attributable to actual sales in a given contract year or a "Guaranteed Minimum Royalty" or "GMR."  License Agreement § 11; *see* Pl. 56.1 Counter ¶ 19.  The GMR was equal to six percent of the Minimum Net Sales

3

amount:  $180,000 for the first contract year, and $270,000 for the second contract year.  License

Agreement §§ 11-12; *see* Pl. 56.1 Counter ¶ 20.

The Agreement contained several other terms relevant to the current dispute.  With

respect to the types of products covered by the Agreement, the parties agreed that "[f]or the

avoidance of doubt, if there is any disagreement between [Exist] and any other licensee of [Body

Glove] involving the products covered by their respective licenses, the dispute shall be resolved

by [Body Glove], in good faith in its sole discretion and any such resolution shall be final and

binding."  License Agreement § 2; *see* Def. 56.1 Counter ¶ 20.

Additionally, the Agreement provided that "[a]ll Products must be approved in writing

(email being sufficient) by [Body Glove] prior to their sale."  License Agreement § 15; *see* Def.

56.1 Counter ¶ 16; Pl. 56.1 Counter ¶ 26.  Furthermore, "[a]ll advertising, marketing and

promotional materials using the Licensed Property (including, but not limited to, creative

materials, packaging, signage, catalogs, web artwork, advertising, and collateral) must be

approved in writing by [Body Glove] (email being sufficient) prior to the public presentation of

such materials."  License Agreement § 15; Pl. 56.1 Counter ¶ 27.  As part of this approval

process, Body Glove agreed that it would "use best business efforts to give written approval or

reasons for non-approval within TEN (10) days of receipt of [Exist]'s request."  License

Agreement § 15; Pl. 56.1 Counter ¶ 28.  The Agreement provided that Body Glove "shall have

final approval rights and all approval rights of [Body Glove] may be withheld in its sole

discretion."  License Agreement § 15; *see* Def. 56.1 Counter ¶ 16.

Body Glove also represented and warranted that it had "the legal right and authority to

grant the rights and license under this Agreement" and that "it has not conducted any act or

entered into any agreement that violates or precludes any of the rights granted to [Exist]

hereunder."  License Agreement § 23.

The Agreement further outlined the parties' termination rights.  Under the Agreement, "[i]f [Exist] fail[ed] to manufacture and ship any Products [by the First Market Date, February 1, 2018], [Body Glove] shall have the right to terminate the agreement with thirty (30) days prior written notice."  License Agreement § 18; *see also id.* § 9.  Moreover, Body Glove had the right to terminate the Agreement "immediately by and upon notice to [Exist], in the event that [Exist] defaults upon or breaches this Agreement in any manner and for any reason and does not cure such breach of default" within a specific time frame.  *Id.* § 18.  The Agreement expressly included an integration clause, and constituted the complete agreement between the parties, superseding any prior understandings, and could only be modified, amended, or terminated in writing.  *Id.* § 25.

Finally, the Agreement contained a clause entitled "Personal Guaranty."  *Id.* § 24.  The clause stated that "the undersigned ('Guarantor'), hereby unconditionally guarant[e]es that [Exist] shall perform and observe each and every monetary obligation under the Agreement" and will perform under the Agreement should Exist fail to do so.  *Id.*  Indeed, the section specifically stated that "Guarantor hereby unconditionally guarant[e]es that all sums payable by [Exist] pursuant to or in connection with the Royalties and Guaranteed Minimum Royalties due under this Agreement promptly shall be paid in full when due."  *Id.*  The Guarantor would promptly pay if Exist fails to do so.  *Id.*  On the signature page, Defendant Joshua Glickman signed his name under the "Guarantor" heading, and listed his "Title" as "President."  *Id.* at p. 7.  Under the "Exist, Inc." heading, Shaul Ashkenazi signed his name, and listed his "Title" as "Vice President."  *Id.*

## II.     Body Glove's Other Licenses

The parties do not dispute that "99.9[%] of Body Glove's licenses are exclusive, . . . and Body Glove has a legal team that ensures there are no overlaps in their license agreements."  Pl. 56.1 Counter ¶ 4.  Prior to entering into the Agreement, the parties understood that Exist would sell its products in resorts and vacation areas.  *See* Def. 56.1 Counter ¶ 11 (noting that the market Exist would sell its licensed products in would be "resorts, breach, any vacation area," and included also "chain stores, beach chain stores," etc.); *see also* Pl. 56.1 Counter ¶ 10.  Exist knew of other companies that were negotiating license agreements with Body Glove, including the entity that later entered into a license with Body Glove on or about January 1, 2014 (████ or the "Other Licensee") – though Exist contends it did not know the term or scope of those licenses.  *See* Def. 56.1 Counter ¶¶ 12-13; Pl. 56.1 Counter ¶ 67.  Nevertheless, Exist did not view the Other Licensee as a "concern."  Def. 56.1 Counter ¶ 14.  The parties also agree that the Other Licensee's agreement with Body Glove was amended on or about May 1, 2017, just eight days before the Agreement between Exist and Body Glove was signed.  Pl. 56.1 Counter  ¶ 79.

Body Glove's license with the Other Licensee is also exclusive, but the parties disagree as to whether Exist's Agreement overlapped with the license of the Other Licensee.  *See* ECF No. 51-1 ("Sealed Pl. 56.1 Counter") ¶ 68.  The Other Licensee was permitted to sell products, including but not limited ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████  *Id.* ¶ 82.  The Other Licensee was authorized to sell ████████████████████████████  *Id.* ¶ 72.  Body Glove points out that the license with the Other Licensee ██████████████████ as the

██████████████████ Exist and the Other Licensee are not competitors, Exist was not permitted to sell swimwear, and Exist's channels were for "lower end stores," such as tourist shops. *See id.* ¶¶ 71-76. While both licenses permitted Exist and the Other Licensee to use Body Glove's trademark with respect to similar products in some of the same areas, Body Glove contends that they were selling in different channels; Exist had the resort channel, and the Other Licensee was selling in higher end specialty stores. *See id.* ¶¶ 73-77. Exist disputes these purported facts. However, it is not disputed that during the term of the Agreement, Exist and Body Glove communicated about possible overlap between the two licenses. *See* Pl. 56.1 Counter ¶¶ 85-86 (disputing relevance of communications, but not fact of their existence). In September 2017, Exist and Body Glove negotiated a letter from Exist to customers announcing their partnership, and the resulting announcement referenced "other Body Glove licensees across swimwear and active wear who will of course continue as Exist joins the brand." Sealed Pl. 56.1 Counter ¶ 88 (quoting ECF No. 51-6).

### III.    Parties' Performance of the Agreement

Several issues arose during the term of the agreement.

#### A.  The Hangtags

The first issue between the parties involves "hangtags." The parties do not define hangtags in their papers, but appear to agree that hangtags are the tags attached to articles of merchandise that provide information about the merchandise. *See Hangtag*, Merriam Webster Dictionary, available at: https://www.merriam-webster.com/dictionary/hangtag (last visited March 31, 2023). After the parties entered the Agreement, Body Glove sent Exist its "brand asset folder," and several guides for the Licensed Products, including a "trim guide," which set forth the dimensions of the trademark, Def 56.1 Counter ¶¶ 35-37, and – according to Exist, six months later – a "packaging guide," which set forth sizing, the layer of shine for the logo in the

hangtag, and the type of paper to use for the hangtag, *id.* ¶¶ 38-39.  During the term of the Agreement, Body Glove and Exist communicated about approvals of products and hangtags, though the parties dispute the timeliness of certain of these communications.  *See id.* ¶¶ 45-47. The parties also dispute whether and to what extent each party contributed to delays in product approvals and subsequent product production.  *See, e.g.*, Pl. 56.1 Counter ¶¶ 29-43.  In particular, Exist points to testimony and emails which purportedly show that Body Glove did not timely respond to Exist's request for approval about a design for the products' hangtags; Exist asked Body Glove to send over an example of a hangtag in August 2018, which Body Glove never did, and Body Glove only provided comments on the hangtag after Exist sent the company a PDF in November 2018.  *See id.* ¶¶ 30-39.  In response, Body Glove points to testimony that Exist did not follow the guides provided to it, making it more difficult for Body Glove to approve packaging, and notes that the Agreement does not obligate it to provide sample versions of hangtags.  *Id.*

The parties do not dispute that Body Glove required Exist to use the term "Body Glove Resort" (the "Altered Mark") on its hangtags, but they disagree on the propriety of this requirement.  *See id.* ¶¶ 51-59.  Exist argues that this requirement was not in the guides or agreement, and it contributed to lost sales.  *Id.*  Body Glove contends that it was standard for packaging like a hangtag to require category-specific words, such as "Active" and "Swim," as is clear from its 2018-2019 packaging guide.  *See id.*; *see also* ECF No. 41-1 ("Sealed Examples of Active and Swim Hangtags").  Body Glove also argues that there is otherwise no evidence that this was of material import to customers.  Pl. 56.1 Counter ¶¶ 55, 58-59.  Finally, Exist contends that the delay in approval for the hangtags resulted in delays to the production process, but Body Glove argues that Exist was the cause of any delays.  *Id.* ¶¶ 40-41.

### B.  The Trade Shows

Exist also takes issue with Body Glove's conduct at trade shows.  The parties both attended at least one trade show in 2017, and two trade shows in 2018.  Def. 56.1 Counter ¶ 54. At those shows, Exist had "its own independent booths at the resorts section" of each show.  *Id.* ¶ 55.  Other licensees of Body Glove sold their products out of Body Glove's booth.  *Id.* ¶¶ 55-58; Pl. 56.1 Counter ¶¶ 92-95; 98-99.  A witness for Exist testified that during negotiations prior to the execution of the Agreement, Exist made it clear that "it was extremely important" that Exist "be included Body Glove's booth at tradeshows."  Pl. 56.1 Counter ¶ 89.  According to Exist, Body Glove "initially promised Exist that Exist would be able to sell out of Body Glove's booth."  *Id.* ¶ 90.  Body Glove disputes these facts, and notes that the Agreement – which expressly states that it constitutes the complete agreement between the parties (License Agreement § 25) – contains no provision related to trade shows.  *See* Pl. 56.1 Counter ¶¶ 89-90. Body Glove also points to correspondence in which Body Glove told Exist it was "likely [to] have a challenge for resort wear in the space we have" so it made "the most sense to have Exist display in the resort section of the show" just as its surfboard and sunglasses licensee often does. *See id.* ¶ 90 (quoting ECF No. 35-21).  According to Exist, Body Glove permitted every other licensee to sell from Body Glove's trade show booth, but not Exist.  *Id.*  ¶¶ 92-95.  Exist further contends that it had trouble selling Body Glove's merchandise from its own booth because potential customers would go to Body Glove's booth to make purchases; Exist also claims potential customers "thought that Exist's Body Glove merchandize was fake because it was not located in Body Glove's booth – where every other Body Glove licensee [at the trade show] was located."  *Id.*  ¶¶ 99-100.  Body Glove disputes that there is any evidence that Exist was harmed by not being able to sell from Body Glove's trade show booth, *see id.* ¶¶ 99-101, characterizing Exist's assertion as mere speculation, *see* Pl. Opp. at 15-16.

### C.  The Amendment

In March 2018, the parties began negotiating an Amendment to the License Agreement to "alter[] payment dates."  Def. 56.1 Counter ¶ 59.  The Amendment was executed on August 27, 2018, and provided the following:

> The parties mutually acknowledge that through no fault of either Party the First Market Date in Section 9 and Minimum Net Sales amount for Contract Year 1 listed in Section 10 of the Agreement . . . will not be achieved, and such shortfalls shall not be a breach of the License Agreement.

ECF No. 38-11 (the "Amendment").  The Amendment further provided that some sections of the License Agreement shall be "hereby deleted and replaced" with language from the Amendment. *See id.* § 3 (extending term of Agreement to June 30, 2020); § 4 (providing for renewal term after June 30, 2020); § 5 (providing for Minimum Net Sales at same rates as in Agreement, but for new contract year through June 30, 2020); § 6 (providing for same GMR rates through new term).  Those changes essentially extended the term of the Agreement and payments dates.  The Amendment also added an agreement that Body Glove would "agree[] to discuss the possibility of [Exist's] inclusion in [Body Glove's] booth at Surf Expo and other relevant trade shows as they arise."  *Id.* § 7(b).  Finally, the Amendment stated that "[e]xcept as specifically amended and/or modified by this First Amendment, the License Agreement is hereby ratified and confirmed and all other terms of the License Agreement shall remain in full force and effect, unaltered and unchanged by this First Amendment."  *Id.* § 7(e).  Defendant Glickman signed the Amendment for Exist, but there was no signature line for a guarantor.  *Id.* at p. 5.

The parties agree that prior to the execution of the Amendment, Exist had been producing licensed products using the word "resort" on the hangtag, *see* Def. 56.1 Counter ¶ 66, and Exist had attended trade shows using its own booth, *see id.* ¶ 67.

### D.  Failure to Pay

It is undisputed that Exist has not made a payment to Body Glove since May 30, 2019.

Def. 56.1 Counter ¶ 72.  About $225,000 remains due under the Agreement and the Amendment,

representing the remainder of the GMR.  *Id.* ¶¶ 71, 78-80.

### IV.    Procedural History

Body Glove commenced this action on February 9, 2021.  *See generally* Compl.  Body

Glove alleges that Exist breached the Agreement by failing to pay the full GMR, and that

Defendant Glickman breached the personal guaranty provision when he did not step in to pay

after Exist failed to pay.  *See id.* ¶¶ 35-45.  On April 16, 2021, Exist answered the Complaint,

denying Body Glove's claims, asserting 19 largely boilerplate affirmative defenses, and alleging

counterclaims for breach of contract and breach of the implied covenant of good faith and fair

dealing.  *See generally* Ans.  Exist alleges that Body Glove breached the Agreement by requiring

Exist to use "resort" in connection with the hangtags and failing to provide an exclusive license

given its relationship with the Other Licensee.  *Id.* at p. 19.  Exist further claims that Body Glove

breached its obligation of good faith and fair dealing by again requiring Exist to use "resort" on

the hangtags and by refusing to allow Exist to join the Body Glove official booth at trade shows.

*Id.* at p. 20.  On May 7, 2021, Body Glove filed an answer to Exist's counterclaims, denying all

claims and asserting 13 largely boilerplate affirmative defenses.  *See*  ECF No. 14 ("Ans. to

Counterclaims").

Body Glove subsequently moved for judgment on the pleadings with respect to Exist's

counterclaim for breach of the covenant of good faith and fair dealing, and with respect to

Exist's counterclaims to the extent they sought punitive damages.  *See* ECF Nos. 15-19.  At a

conference on January 14, 2022, the Court granted Body Glove's motion, without prejudice to

replead, with respect to Exist's counterclaims for punitive damages, and granted the motion with

respect to Exist's counterclaim for breach of the covenant of good faith and fair to the extent it was based on allegations that Body Glove required that Exist use the phrase "Body Glove Resort" on its hangtags, which would be duplicative of its breach of contract claim.  *See* ECF No. 25.  Exist did not replead any of its claims.

On August 19, 2022, the parties filed their opening briefs in support of their cross-motions for summary judgment.  *See* ECF Nos. 35, 37, 38, 39.  On August 23, 2022, the Court granted Body Glove's motion to seal certain submissions.  ECF No. 44.  The parties filed their opposition briefs on September 9, 2022, and the Court granted Body Glove's motions to seal some of those submissions that day and on September 13, 2022.  *See* ECF Nos. 45, 46, 47, 49, 50, 51, 53.  The case was reassigned to the undersigned on September 19, 2022.  *See* ECF No. 54.  On September 23, 2022, the parties filed their reply briefs.  *See* ECF Nos. 55, 57, 59.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, a moving party is entitled to summary judgment if, on any claim or defense, that party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "genuine" dispute is one in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" only if it "might affect the outcome of the suit under the governing law . . . ."  *Id.*  Thus, "the substantive law will identify which facts are material."  *Id.*

At summary judgment, the Court's task is simply to "discern[] whether there are any genuine issues of material fact to be tried, not to decid[e] them."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  Therefore, "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment."  *Fischl v. Armitage*, 128 F.3d 50,

55 (2d Cir. 1997).  The Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Est. of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).  "Affidavits submitted in support of or in opposition to the summary judgment motion must 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (internal citation omitted); *see also* Fed. R. Civ. P. 56(c)(4).  "When deciding cross-motions for summary judgment, the standard to be applied 'is the same as that for individual summary judgment motions and a court must consider each motion independent of the other.'" *Garrett v. Music Publ'n Co. of Am., LLC*, 740 F. Supp. 2d 457, 460 (S.D.N.Y. 2010) (quoting *Schultz v. Stoner*, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004)).

## DISCUSSION

The Court considers each motion for summary judgment independently and will resolve all ambiguities against the nonmoving party.  Nevertheless, because the parties' motions overlap regarding the claims or defenses for which they seek resolution, the Court will address each claim and defense, and the parties' arguments with respect to them, rather than address each motion separately.

## I.  Body Glove's Causes of Action

Body Glove moves for summary judgment on its two claims for breach of contract and breach of the personal guaranty, arguing that there is no genuine issue of material fact that would lead a reasonable jury to return a verdict for Exist or Glickman on its claims.  Pl. Br. at 5-7.  As part of its motion, Body Glove also argues that Exist and Glickman's related affirmative defenses fail as a matter of law.  *Id.* at 7-13.  Exist argues, in its cross-motion for summary

judgment, that because "undisputed facts" show that Body Glove itself breached the Agreement from the moment of execution – which is also the basis for its counterclaim –no reasonable jury could return a verdict for Body Glove on either of its contract claims.  Def. Br. at 14. Defendants also argue that the personal guaranty was void in light of the later Amendment and that Glickman never intended to be personally liable.  *Id.* at 20.

### A.  Body Glove Claim 1:  Breach of Contract by Exist

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages."  *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011).  Summary judgment regarding a claim for breach of contract is only "appropriate . . . where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning."  *Farago Advert., Inc. v. Hollinger Int'l, Inc.*, 157 F. Supp. 2d 252, 258 (S.D.N.Y. 2001).  A contract is ambiguous if its language is "capable of more than one meaning when viewed, objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Bank of N.Y. Tr., N.A. v. Franklin Advisors, Inc*., 522 F. Supp. 2d 632, 635 (S.D.N.Y. 2007) (quoting *Seiden Assoc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)).

Body Glove and Exist do not dispute that an agreement existed between them.  *See, e.g.*, Pl. Br. at 6; Def. 56.1 Counter ¶ 18.  Nor do they dispute that Exist has not paid Body Glove $225,000.00, or the remainder of the GMR as outlined in the Agreement and Amendment, or that Body Glove suffered financial loss, or damages, from that failure to pay.  *See, e.g.*, Def. 56.1 Counter ¶¶ 70-72.

Rather, Defendants focus on Body Glove's performance under the Agreement.  To prevail on a breach of contract claim, a party must also prove "that it performed its own obligations under the contract." *Innovative Biodefense, Inc. v. VSP Techs., Inc.*, 176 F. Supp. 3d 305, 317 (S.D.N.Y. 2016) (citation omitted).  If a party "has substantially failed to perform its side of the bargain or, synonymously, . . . has committed a material breach," then the other party may be excused from its breach or nonperformance. *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007); *see Bear, Stearns Funding, Inc. v. Interface Grp. – Nev., Inc.*, 361 F. Supp. 2d 283, 291 (S.D.N.Y. 2005) ("A fundamental principle of contract law provides that the material breach of a contract by one party discharges the contractual obligations of the non-breaching party.").  "A breach is not material, and the aggrieved party is not excused from performance of its obligations, if the breaching party has substantially performed his end of the contract." *Innovative Biodefense, Inc.*, 176 F. Supp. 3d at 317 (internal brackets and citation omitted); *see Express Freight Sys. Inc. v. YMB Enterprises Inc.*, No. 20-cv-00186 (ARR) (LB), 2022 WL 3682294, at *9 (E.D.N.Y. Aug. 25, 2022) ("The measure of whether a party has adequately performed under a contract is substantial performance.").  To determine whether a party has substantially performed under a contract, "several factors must be considered, including the ratio of the performance already rendered to that unperformed, the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved party has already received the substantial benefit of the promised performance." *Hadden v. Consol. Edison Co. of N.Y.*, 34 N.Y.2d 88, 96 (1974); *see also Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 311 (2d Cir. 2016) ("Substantial performance is performance, the deviations permitted being minor, unimportant, inadvertent, and unintentional."

(internal citation omitted)).  Therefore, generally speaking, "[t]he issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain."  *Merrill Lynch & Co. Inc.*, 500 F.3d at 186.

Defendants argue that Body Glove failed to perform its obligations under the contract, thereby excusing Exist from paying the entire GMR, and defeating Body Glove's motion for summary judgment with respect to Body Glove's breach of contract claim.  *See* Def. Opp. at 11-12.  They make the same arguments in opposing Body Glove's motion for summary judgment with respect to Defendants' affirmative defenses for failure to state a claim (their first affirmative defense), prior breach (their fifth and nineteenth affirmative defenses), as well as with regard to their own motion for summary judgment on their counterclaims.  *Id.* at 15; Def. Br. at 15 (arguing that "Body Glove cannot succeed on its breach of contract actions as it did not perform pursuant to the Agreement, immediately breached the agreement upon execution, and continued to breach the Agreement and the Amendment"); *see id.* at 14-19; *see infra* Sections II, III(A).

Defendants advance at least four theories as to how Body Glove failed to perform its obligations under the Agreement:  (1) Body Glove breached the "exclusivity provision of the Agreement" given its license with the Other Licensee; (2) by executing a license with the Other Licensee, Body Glove breached its warranty in the Agreement that it had not entered into another agreement that violated any of Exist's rights; (3) Body Glove breached the Agreement by requiring Exist use the word "resort" on its hangtags; and (4) Body Glove breached the "Approvals provision" when it did not timely respond to Exist's requests for approval.  *See* Def. Opp. at 12.  In response, Body Glove argues that the language of the Agreement unambiguously permitted Body Glove to take the actions that Defendants now contend are a breach.  *See* Pl. Reply at 1-2, 7; Pl. Opp. at 12-15.  Furthermore, because Defendants did not terminate the

contract upon notice of any of these breaches, they are still obligated to pay the GMR arrears. *See* Pl. Reply at 4.

For Body Glove to prevail on its motion for summary judgment with respect to its breach of contract claim, "it must be clear at the outset that there are no genuine issues of material fact that either" Body Glove "did not breach an agreement, or if it did, that its breach does not rise to the appropriate level of materiality to justify termination of the agreement." *Bear, Stearns Funding, Inc.*, 361 F. Supp. 2d at 291.  The question of whether a party materially breached a contract is synonymous with whether that party "has substantially failed to perform its side of the bargain . . . ." *Merrill Lynch & Co. Inc.*, 500 F.3d at 186.  The Court therefore first considers whether there are material disputes of fact as to whether Body Glove performed under the Agreement, or whether it materially breached, based on the four grounds propounded by Defendants.

### 1. Alleged Breach of Exclusivity Provision

First, Defendants argue that Body Glove breached the "exclusivity provision of the Agreement" by signing an overlapping license with the Other Licensee.  *See* Def. Opp. at 11-12; Def. Br. at 15-17.  Under the Agreement, Body Glove "grant[ed] to [Exist] the exclusive right to use the Licensed Property solely in connection with the manufacture, distribution and sale of Products solely in the Territory to Approved Customers in the Channels of Distribution (as defined below) during the Term . . . ."  License Agreement § 4.  Exist contends that its Agreement "overlap[ped]" with the license between the Other Licensee and Body Glove.  *See* Def. Br. at 16.  In support of their motion for summary judgment, Defendants point only to the undisputed fact that "99.9[%]" of Body Glove's licenses are exclusive and that Body Glove

employs a legal team to ensure there are no overlapping agreements.  *Id.* (citing Pl. 56.1 Counter ¶ 4).  But these facts do not address whether the two agreements overlap.

Looking to the record and the agreements themselves, although there is some ambiguous language, the two license agreements do not facially overlap.  The Other Licensee's agreements are filed in this action under seal.  *See* ECF No. 37-4 ("Other Licensee First Agreement"); ECF No. 37-6 ("Other Licensee Second Agreement").  The Other Licensee Second Agreement commenced on May 1, 2017, days before Exist's Agreement was executed.  Other Licensee Second Agreement at 1.  Under that license, the Other Licensee was permitted to use Body Glove's trademark in connection with the following products: ████████████████

████████████████████████████████████████████

████████████████████████████████████████ It also permitted the Other Licensee to continue manufacturing and selling, for parts of the term of the contract, ████

████████████████████████████ *See id.* (incorporating by reference Other Licensee First Agreement Schedule C); *see also* Other Licensee First Agreement § C.  In comparison, under Exist's Agreement, Exist was permitted to sell the following products: "(1) men's sportswear, activewear, resortwear, and baseball hats; and (2) women's sportswear and resortwear including dresses and baseball hats (which may include co-branded products) that in each case bear the Licensed Property . . . ."  License Agreement § 2.  Body Glove contends that the agreements do not overlap because ████████████ not a licensed product under Exist's Agreement."  Sealed Pl. 56.1 Counter ¶ 73.  While the products in Exist's Agreement include broad terms such as "sportswear, activewear, [and] resortwear," that could

potentially create an overlap with the Other Licensee, Defendants do not point to a precise

overlap and there is no direct overlap on the face of the agreements.

Regardless of any potential overlap in product categories, Body Glove contends that,

because the license with the Other Licensee does not "reference or mention 'Resort' as the

distribution channel," and because Exist and the Other Licensee are not competitors, the licenses

do not overlap.  Sealed Pl. 56.1 Counter ¶¶ 71-76.  Body Glove contends that Exist sells through

the resort channel, and the Other Licensee sells in higher end specialty stores.  *See id.* ¶¶ 73-77.

It is true that Exist's Agreement defines the channels of distribution as "resort retailers," which

the parties agree were understood to mean "stores at any tourist destinations or a resort itself."

Pl. 56.1 Counter ¶ 10.  The Other Licensee's Second Agreement, which incorporated terms from

the Other Licensee's First Agreement, does not mention resort retailers or resort.  *See* Other

Licensee First Agreement; Other Licensee Second Agreement.  The Other Licensee's

distribution channel is defined as ████████████████████████████████████████████

████████████████████████████████  Other Licensee First Agreement § 4(h).  While

there could be some ambiguity as to an overlap between the licenses because Other Licensee's

license does not ████████████████████████████████  Defendants did not point to a

specific overlap and the agreements do not contain facially overlapping sales channels.

Notwithstanding the foregoing, even if there is some ambiguity in the designated

products and channels of distribution, the terms of the Agreement give Body Glove "sole

discretion" exercised in good faith to resolve any disagreement over the scope of the products

under its exclusive licenses.  The Agreement provides:  "[f]or the avoidance of doubt, if there is

any disagreement between [Exist] and any other licensee of [Body Glove] involving the products

covered by their respective licenses, the dispute shall be resolved by [Body Glove], in good faith

in its sole discretion and any such resolution shall be final and binding."  License Agreement § 2;
*see* Def. 56.1 Counter ¶ 20.  According to Body Glove, it adhered to this process during the term
of Exist's Agreement by comparing the retailer lists of Exist and the Other Licensee and
determined that there was no overlap.  Sealed Pl. 56.1 Counter ¶¶ 85-86.  Exist does not contest
that Body Glove undertook a process of comparing the retailer lists.  Given that the licenses do
not overlap on their face and Body Glove had the undisputed right in its sole discretion to resolve
any ambiguities with respect to product overlap, the Court finds that there are no genuine issues
of material fact that could lead a jury to conclude that Body Glove breached the exclusivity
provision of the Agreement.

The Court finds persuasive a recent New York decision that concluded that a license
agreement with similar language barred a claim by the licensee that the licensor breached the
exclusivity provision of its agreement.  *See Innovative Concepts & Design, LLC v. AL Infinity,*
*LLC*, 202 A.D.3d 594, 595-96  (1st Dep't 2022).  In that case, the First Department affirmed a
trial court order dismissing a breach of contract claim where the plaintiff complained that the
"defendant [had] issued conflicting exclusive licensee agreements . . . ."  *Id.*  Because "[t]he
licenses [did] not conflict[] on their face," and because the license "contemplate[d] that the
precise definition of products is not always possible, and specifie[d] that defendant will resolve
disputes over such definitions in its sole discretion," the court held that there could be no claim
that the defendant breached the license where the defendant had exercised its authority to
conclude that the licenses did not overlap.  *Id.* at 596.

Other New York courts have similarly concluded that, where a contract or license gives
one party significant discretion, generally speaking, the cause of action that can provide a
remedy for an impermissible exercise of that discretion is a claim for breach of the implied

covenant of good faith and fair dealing. *See, e.g.*, *Miller v. Great Lakes Med. Imaging, LLC*, 527 F. Supp. 3d 492, 500 (W.D.N.Y. 2021); *S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 505-06 (S.D.N.Y. 2021) (noting that unless the covenant of good faith and fair dealing would "negate an expressly bargained-for clause that allows a party to exercise its discretion," a party cannot exercise its discretion "arbitrarily or irrationally" (internal citation and brackets omitted)). But Exist did not bring a counterclaim for breach of duty of good faith and fair dealing on the grounds that Body Glove acted arbitrarily with respect to the potential overlap between the licenses. *See* Ans. at 20 (alleging breach of implied covenant of good faith and fair dealing only on the grounds that Body Glove required Exist to use "Resort" term on hangtags, and did not permit Exist to use Body Glove's trade show booth).

Even if it did, the undisputed facts demonstrate that Body Glove did not act arbitrarily, irrationally, or in bad faith, in exercising its discretion to resolve disputes between licensees. As Defendants admit, Body Glove employed a legal team to ensure that there was no overlap in its licenses. Pl. 56.1 Counter ¶ 4. In August 2017, in an effort to ensure there was no overlap between the Other Licensee and Exist, Body Glove reviewed the retailer lists for each license. *See* ECF No. 37-7 ("Sealed Aug. 2017 Correspondence") at 5-6 (discussion about reviewing customer lists). The parties understood that there could be gray areas with products, as the documents demonstrate that the parties, at least during the early months of the contract, were contemplating executing a "long agreement" to clarify the scope of the products. *See* ECF No. 37-8 ("Sealed Sept. 2017 Correspondence") ("Thanks and there certainly are some gray areas. I have been working . . . on your list of accounts . . . which gives some clarity."). Finally, Exist has not pointed to evidence of an actual overlap in licensees' products; it merely offers

vague evidence that one of its agents "saw" a "product [that] was being sold" that it viewed as part of its exclusive rights.  *See* Def. 56.1 Counter ¶ 74.

None of Exist's evidence demonstrates that Body Glove acted arbitrarily or in bad faith. Rather, the evidence shows that Body Glove exercised its express authority under the Agreement by analyzing the retailers of Exist and the Other Licensee to see if there was overlap in the scope of the products sold by its two licensees, and concluded that there was not.  Therefore, there is no genuine dispute that Body Glove performed according to the terms of the Agreement by providing Exist with the trademark and determining in its sole discretion that there was no overlap between its licensees, as it was expressly authorized to do.  Just as the court held in *Innovative Concepts & Design* with respect to a similar license agreement, given the sole discretion afforded to the licensor to resolve overlap disputes, Defendants have failed to show that there are material facts in dispute that could lead a reasonable jury to conclude that Body Glove breached the exclusivity provision of the agreement.  Accordingly, Defendants' arguments – both that they are entitled to summary judgment on Body Glove's contract claim, and on their affirmative defenses – are rejected.

Even if the terms of the Agreement did not preclude a claim that Body Glove materially breached the Agreement's exclusivity provision, Defendants waived their defense on these grounds because they did not terminate the agreement upon notice of the alleged breach.  "Under New York law, when one party has committed a material breach of a contract, the non-breaching party is discharged from performing any further obligations under the contract, and the non-breaching party may elect to terminate the contract and sue for damages."  *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.*, 262 F. Supp. 2d 134, 145 (S.D.N.Y. 2003).  If the non-breaching party decides not to terminate the agreement, "it loses the right to terminate the contract on the

basis of the earlier breach." *Id.*  Likewise, it may not "refus[e] to perform its end of the

bargain[.]"  *ARP Films, Inc. v. Marvel Ent. Grp., Inc.*, 952 F.2d 643, 649 (2d Cir. 1991); *see also*

*Nostrum Pharms., LLC v. Dixit*, No. 13-cv-08718 (CM), 2016 WL 5806781, at \*21 (S.D.N.Y.

Sept. 23, 2016) ("By continuing to collect a paycheck from Nostrum until the expiration of the

2011 Employment Agreement, Defendant forfeited the right to complain about Plaintiffs' alleged

prior breach."); *Summit Props. Int'l, LLC v. Ladies Pro. Golf Ass'n*, No. 07-cv-10407 (LBS),

2010 WL 2382405, at \*5 (S.D.N.Y. June 14, 2010) ("If Summit affirmed the contract, it would

have been obligated to perform all of its obligations under the Agreement."); *Glob. Switching,*

*Inc. v. Kasper*, No. 06-cv-00412 (CPS), 2006 WL 385315, at \*5 n.4 (E.D.N.Y. Feb. 17, 2006)

("If the second party elects to continue with the contract, it is not freed from its obligations under

the contract, despite the first party's breach."); *Marvel Ent. Grp., Inc. v. ARP Films, Inc.*, 684 F.

Supp. 818, 821 (S.D.N.Y. 1988) ("[P]laintiffs were not entitled to affirm and exploit their rights

under the contract and at that [sic] the same time withhold their own performance indefinitely

pending adequate assurances.").

Here, Defendants do not dispute that, before entering into the Agreement, they were

aware that Body Glove had licenses with other entities, including the Other Licensee.  *See* Def.

56.1 Counter ¶¶ 12-14.  Defendants maintain that they did not know the scope or term of those

licenses, *see id.* ¶¶ 10-11, and that they were not concerned with the Other Licensee during the

negotiation of the Agreement, *see id.* ¶ 14.  Just after the Agreement was executed, Body Glove

requested retail lists from both Exist and the Other Licensee, under non-disclosure agreements,

in order to determine whether there was overlap under the provisions of the Agreement.  Sealed

Pl. 56.1 Counter ¶ 86.  Exist contends that it thereafter "provide[d] Body Glove with notice [of

the alleged breach of exclusivity] in writing" in the summer of 2017.  Def. 56.1 Counter ¶ 74.  In

August 2017, Exist requested that the "gray area" between its license and the Other Licensee's license be sorted out.  *See* Sealed Aug. 2017 Correspondence at 5; *see also* ECF No. 37-9 ("Sealed July 21, 2017 Correspondence") (acknowledging that Body Glove was going to compare distribution lists between Exist and Other Licensee); ECF No. 37-10 ("Sealed July 23, 2017 Correspondence") (informing Body Glove that there is "some confusion in the marketplace" regarding the short form license).  In September 2017, those "gray areas" were acknowledged yet again, *see* ECF No. 37-8 ("Sealed Sept. 2017 Correspondence"), and a representative for Exist explained: "From my perspective, there continues to be products that fall under both licensee's [sic] grant and I fear both licensee's [sic] will be selling very similar product," Sealed Aug. 2017 Correspondence at 2.  But rather than terminate the license based on what it perceived to be Body Glove's alleged breach, Exist continued to produce and distribute products pursuant to the Agreement.  In fact, the parties later entered into the Amendment in 2018, and Exist admits that "Body Glove did not correct the breaches in the Agreement following the Amendment . . . ."  Def. 56.1 Counter ¶ 68.  Therefore, on these facts, there can be no dispute that Exist did not elect to terminate the contract on the basis of a purported breach of the exclusivity provision, and therefore was not excused from its own performance to pay the GMR.  *See McDonald's Corp. v. Robert A. Makin, Inc.*, 653 F. Supp. 401, 403 (W.D.N.Y. 1986) ("Nowhere do the defendants deny their failure to pay these fees since October, 1985.  Yet, defendants have maintained possession and operation of the franchise property.").  This, too, precludes Defendants from arguing that Body Glove materially breached the Agreement's exclusivity provision as a defense to the breach of contract claim.

###   2.   Alleged Breach of Warranty

As a further defense against Body Glove's breach of contract claim, Defendants relatedly argue that Body Glove did not perform – or materially breached – the Agreement "upon executing the Agreement" because Body Glove warranted that it had "not conducted any act or entered into any agreement that violates or precludes any of the rights granted to [Exist] hereunder,"  License Agreement § 23, while it had in fact violated Exist's "right of exclusivity," Def. Br. at 17.  Defendants also argue that this breach is an affirmative defense, and the basis for its counterclaim for breach of contract.  The Court has already determined that Body Glove did not breach the exclusivity provision under the terms of the Agreement, *see supra* Section I(A)(1), and therefore, there can be no breach of the warranty provision based on purported exclusivity violations.[2]

###   3.   Alleged Breach for Requiring "Resort" Term on Hangtags

Defendants next argue that Body Glove breached the Agreement, or failed to substantially perform, because Body Glove would not approve hangtags on products that did not use the term "BODY GLOVE RESORT," or what they have deemed an "Altered Mark."  Def. Br. at 17-18; *see* Def. Opp. at 12.  Defendants claim that this requirement was not in the Agreement, and customers were disinclined to buy products that had the word "resort" on the hangtags.  *See* Def. Br. at 18.  Body Glove argues that based on the unambiguous language of the Agreement, it did not fail to substantially perform under the contract by requiring that Exist's

---

[2] It is not clear that a breach of a *warranty* by one party constitutes a material breach or failure to substantially perform such that it can excuse another party's nonperformance; rather, a breach of warranty is generally considered only an affirmative defense or counterclaim.  *See Barton Grp., Inc. v. NCR Corp.*, 796 F. Supp. 2d 473, 498 (S.D.N.Y. 2011) (concluding that claim that "representations and warranties were untrue is an affirmative defense").  The Court need not resolve this issue, since it concludes there was no breach of the warranty as a matter of law.

hangtags contain the word "resort" because the Agreement gives Body Glove control over "all marketing and advertising." Pl. Reply at 2. Body Glove has also provided examples of hangtags from its "Active" and "Swim" lines, which are similar in appearance to the "Resort" label required for Exist's hangtags. See ECF No. 38-6 ("Sealed Examples of Active and Swim Hangtags"); ECF No. 38-7 ("Sealed Emails with Resort Hangtag Examples").

The Court agrees that Body Glove has not breached the Agreement by conditioning its approval of the hangtags on the inclusion of a descriptor, "resort." The Agreement provides: "[a]ll advertising, marketing and promotional materials using the Licensed Property (including, but not limited to, creative materials, packaging, signage, catalogs, web artwork, advertising, and collateral) must be approved in writing by Licensor (email being sufficient) prior to the public presentation of such materials." License Agreement § 15. That section then goes on to explicitly state: "For the avoidance of doubt, Licensor shall have final approval rights and all approval rights of Licensor may be withheld in its sole discretion." *Id.*

Defendants do not dispute that they eventually received a "packaging guide" – and other guides – from Body Glove, which contained materials related to the hangtags and logos. Def. 56.1 Counter ¶¶ 38-39. Licensors are entitled, and indeed required, to provide oversight and supervisory control over their marks. *See, e.g.*, *Can't Stop Prods., Inc. v. Sixuvus, Ltd.*, 295 F. Supp. 3d 381, 392 (S.D.N.Y. 2018) ("[I]t is unlawful for . . . a trademark owner to grant . . . a license to a licensee for the use of a mark without the retention of supervisory control.") (internal citation omitted); *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 277 F.3d 253, 259 (2d Cir. 2002) ("Indeed, Marvel, as the licensor of the 'X–Men' property, is obliged to maintain some control over the quality of the licensed property as an incident of valid licensing or risk abandonment of its mark."). Body Glove's packaging guide illustrated how the word "SWIM"

26

or "ACTIVE" or other product descriptors – in this case, resort – were required to be used on the hangtags for purposes of selling these licensed products.  *See* Sealed Examples of Active and Swim Hangtags (showing instances of hangtag samples for 2018-2019 period).

Moreover, the Agreement expressly provided Body Glove with approval rights and "sole discretion" over withholding that approval.  Agreement § 15.  As previously discussed, courts applying New York law generally find that provisions in contracts awarding one party sole discretion prevent claims for breach so long as the discretion is not exercised "arbitrarily or irrationally."  *Miller* 527 F. Supp. 3d at 500 (quoting *S. Telecom Inc.*, 520 F. Supp. 3d at 511); *see, e.g.*, *Symquest Grp., Inc. v. Canon U.S.A.*, 186 F. Supp. 3d 257, 264-65 (E.D.N.Y. 2016) (finding no breach of contract where the "plain language of the [contract] grant[ed] [defendant] the sole discretion to terminate [plaintiff's] authorization to continue servicing [defendant's] products"); *Moghtaderi v. Apis Cap. Advisors*, 205 A.D.3d 504, 506 (1st Dep't 2022) (dismissing breach of contract claim based on a rate change because contract provided that defendants were permitted to update the rate "from time to time in their sole discretion"). Defendants do not currently have a counterclaim for breach of good faith and fair dealing based on hangtag approvals because it was previously dismissed by the Court.  *See* ECF No. 25.

In any event, Defendants have not provided evidence – and this Court does not find – that Body Glove has acted arbitrarily, irrationally, or in bad faith, by requiring its licensee to use a designated descriptor on hangtags.  Body Glove generally required the addition of terms such as "ACTIVE" or "SWIM" and other "category-specific" identifiers on the hangtag, as part of "general branding."  Pl. 56.1 Counter ¶ 54.  Body Glove's agent further testified that "all licensees were required to put category-specific branding on the hangtag, Exist being one of those licensees."  *Id.*  In light of Body Glove's "sole discretion" to approve packaging,

Defendants have failed to show that there are material facts in dispute that could lead a reasonable jury to conclude that Body Glove breached the Agreement, or acted arbitrarily or in bad faith, by requiring that the descriptor "resort" be placed on the Exist hangtags.[3]  Moreover, such a breach, even if there was one, would not be material enough to justify nonperformance by Defendants.

### 4.  Alleged Breach of Approvals Provision

Finally, Defendants contend that Body Glove failed to perform, or materially breached, the Agreement by providing late approvals for products and packaging.  *See* Def Op. at 12, 15; Def. Br. at 18-19.  Specifically, Defendants contend that Body Glove took over three months to approve a hangtag design, failed to approve a men's hangtag, and never sent Exist a physical example of a hangtag.  *See* Def. Br. at 18.  In support of this argument, Defendants point to an email exchange between the parties in the summer and fall of 2018.  *See* Pl. 56.1 Counter ¶¶ 30-37 (relying on ECF No. 37-3 ("Sealed Aug. 2018 Correspondence")).  Body Glove disputes Defendants' characterization of this exchange, noting that Body Glove regularly communicated approvals/disapprovals to Exist, and stating it was under no obligation to provide Exist with a sample hangtag.  *See* Pl. Opp. at 14.

Once again, neither the Agreement nor the record supports Defendants' argument.  Under the Agreement, Body Glove "shall have final approval rights and all approval rights of Licensor may be withheld in its sole discretion."  License Agreement § 15.  The Agreement further states that "[u]pon any request for approval by Licensee, Licensor [will] use best business efforts to

---

[3] Defendants' assertion that consumers were less inclined to buy products with the word "resort" on the hangtag, *see, e.g.*, Pl. 56.1 Counter ¶ 55, even if true, does not change the fact that Body Glove had approval rights over all products and packaging with the Licensed Property, and "sole discretion" to withhold that approval, Agreement § 15.

give written approval or reasons for non-approval within TEN (10) days of receipt of Licensee's request." *Id.* § 15.

Contrary to Defendants' assertions, the 2018 email exchange relied upon by Defendants does not show that Body Glove did not respond to an approval request for three months. Rather, the emails show that Exist did not request an approval of certain artwork prior to the three-month stop in communication between the parties and instead, told Body Glove in August 2018 that it "cannot achieve the Body Glove artwork on the black labels . . . as shown in your photo above." Sealed Aug. 2018 Correspondence at 7. After some back and forth, Body Glove asked Exist to "submit the mens and womens hangtag samples to us for quality[.]" *Id.* at 5. In response, Exist noted that "we had a huge delay in our production due to the hangtag/label approval process," and asked Body Glove to "send [a] physical sample to our side along with artwork and dimensions so we are not caused in delay this season again." *Id.* at 5. Exist followed up in November 2018, and sent to Body Glove a proposed women's hangtag in a PDF for the 2019 season. *Id.* at 4. That same day, Body Glove said they were beginning to review the proposals. *Id.* Five days later, Body Glove indicated that it needed to "see quality ASAP" and asked Exist to confirm if the label was for women's wear only. *Id.* at 2-3. When Exist said it could not produce a label to check for quality without approval of the artwork, Body Glove said that the artwork was approved "for womens only." *Id.* at 2.

Defendants have not put forward evidence that any request for approval was not answered in ten days. There was no request for an approval of a particular hangtag in the August 2018 emails. Exist expressly stated that "[c]urrently we have no labels for submission or for approval as we will proceed same as last year's labels." *Id.* at 7. Exist did request a sample hangtag, but only after Body Glove requested that Exist "submit the mens and womens hangtag

samples to us for quality." *Id.* at 5.  Exist, according to the evidence provided to the Court, did not send over a sample for approval until November 2018 – and only sent over a women's hangtag.  After that request was sent, Body Glove approved the women's hangtag in five days – within the timeframe contemplated by the Agreement.  Exist further has not identified anything in the Agreement that obligated Body Glove to provide Exist with sample hangtags.  In sum, Exist has not pointed to any evidence that Body Glove failed to use its "best business efforts" to move quickly to approve specific requests from Exist.  There is also no evidence that Body Glove acted arbitrarily or irrationally in exercising its discretion not to approve the men's hangtag – given that Exist did not provide a sample to Body Glove for approval.  *See, e.g.*, *Miller*, 527 F. Supp. 3d at 500.  Accordingly, Defendants have failed to show that there are material facts in dispute that could lead a reasonable jury to conclude that Body Glove did not perform, or materially breached, the Agreement by delaying the approval of any packaging.  And even if Body Glove did delay approving a hangtag for more than ten days, this alleged breach would not be material enough to justify nonperformance by Defendants.

*          *          *

In sum, there is no dispute that Defendants have failed to pay the GMR as required under the Agreement.  Defendants contend that Body Glove failed to perform, or breached the contract, in the four ways set forth above– thereby excusing Defendants' nonperformance.  Because all of those grounds fail as a matter of law, Body Glove is entitled to summary judgment on its breach of contract claim unless Defendants have a viable affirmative defense, which for the reasons set forth *infra* Section II, they do not.

### B.  Body Glove Claim 2:  Breach of Personal Guaranty by Defendant Glickman

Body Glove next moves for summary judgment on its claim for breach of the personal guaranty by Defendant Glickman.  In New York, a breach of a personal guaranty is akin to a

breach of contract. *See Lakhaney v. Anzelone*, 788 F. Supp. 160, 163 (S.D.N.Y. 1992). "If, in a written instrument a person 'guarantees' payment of another's debt and describes with precision the obligation to which the person is bound, the instrument is a guaranty." *Id.* In order to establish a "*prima facie* entitlement to summary judgment," a party must establish "the execution of the agreements at issue and nonpayment thereunder." *KLS Diversified Master Fund, L.P. v. McDevitt*, 507 F. Supp. 3d 508, 530 (S.D.N.Y. 2020) (citation omitted). Under New York law, an individual corporate officer is not usually personally liable for contracts "executed on behalf of the corporation unless the officer expresses some intention to be personally bound." *Boscov's Dep't Stores, LLC v. AKS Int'l AA Corp.*, No. 01-cv-105880 (GWG), 2003 WL 21576405, at *4 (S.D.N.Y. July 11, 2003) (quoting *W. Joseph Mcphillips Inc. v. Ellis*, 278 A.D.2d 682, 683 (3d Dep't 2000)). Therefore, the Second Circuit has held that "an agent who signs an agreement on behalf of a disclosed principal" will only be "individually bound to the terms of the agreement" if "there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal." *Lerner v. Amalgamated Clothing & Textile Workers Union*, 938 F.2d 2, 5 (2d Cir. 1991) (internal citations omitted).

Cases where New York courts have found "individual liability" are "rare," because "there must be overwhelming evidence of the signatory's intention to assume personal liability." *Mason Tenders Dist. Council Welfare Fund v. Thomsen Const. Co.*, 301 F.3d 50, 53 (2d Cir. 2002) (citation and quotation omitted). To determine whether there is overwhelming evidence of this intent, the following factors ought to be considered: "the contract's length, the location of the liability provision relative to the signature line, the presence of the name of the signatory in the contract itself, the nature of the negotiations leading to the contract, and the signatory's role in the corporation." *Id.* (citation and quotations omitted). Other factors that may be considered

31

include "the structure and content of the signature lines on the agreement, which can help determine whether the guarantor intended to sign the contract in his official capacity only, as opposed to as an individual." *TR 39th St. Land Corp. v. Salsa Distribution USA, LLC (TR 39th II)*, No. 11-cv-07193 (DF), 2015 WL 1499173, at *6 (S.D.N.Y. Mar. 25, 2015) (citation and quotations omitted).

Considering all of those factors here, and even in light of the presumption that a corporate officer is not generally personally liable on a corporate contract, the Court concludes that there are no disputes of material fact as to whether Defendant Glickman agreed to be personally liable for breaches of the License Agreement after it was amended. There is a clear Personal Guaranty provision in the Agreement. That provision states that "the undersigned ('Guarantor'), hereby unconditionally guarant[e]es that [Exist] shall perform and observe each and every monetary obligation under the Agreement" and will perform under the Agreement should Exist fail to do so. License Agreement § 24. This is unlike many of the cases that, applying New York law, determine that a corporate executive has not signed an agreement in his personal capacity. *Cf. TR 39th St. Land Corp. v. Salsa Distrib. USA LLC (TR 39th I)*, No. 11-cv-07193 (DF), 2013 WL 3090441, at *6 (S.D.N.Y. June 18, 2013) (noting absence of "separate portion of the agreement that states an individual signatory will be personally liable, even if acting as a corporate agent"); *Consac Indus., Inc. v. LDZ Comercio Importacao E Exportacao LTDA*, No. 01-cv-03857 (ADS) (ETB), 2002 WL 31094855, at *5 (E.D.N.Y. Aug. 29, 2002) (same).

Other factors also weigh in favor of finding that Glickman intended to be personally bound. The Agreement itself is short, so the personal guaranty provision is not buried within a complex contract. Defendant Glickman does not contest that the line bears his signature. Def. 56.1 Counter ¶ 78. Glickman signed his name specifically under the "Guarantor" line, separate

and apart from Shaul Ashkenazi's signature for the corporation.  *See* License Agreement at p. 7.

Glickman also testified at his deposition that he understood the difference between a corporation

and person, that it was "correct" that he "guaranteed to pay the amount due to Body Glove," and

that he knew: "I was guaranteeing the agreement."  ECF No. 38-13 ("Glickman Depo. 1") at

13:11; 16:20-22; 17:7-9.  There is also evidence in the record that an Exist representative brought

up the "personal guarantee" provision with Exist's management during the negotiation of the

contract.  *See* ECF No. 47-6 ("Sealed April 2017 Correspondence").  Finally, Defendants have

not pointed the Court to any sworn statements by Glickman that he did not intend to be held

personally liable for the GMR should Exist fail to pay.

Defendants put forward only a few facts to argue that Glickman did not clearly intend to

be personally liable on the Agreement.  They contend that he did not understand the guaranty

and was "not sure" if the guaranty was separate from the party's agreement, or if it had

conditions on it.  ECF No. 35-9 ("Glickman Depo. 2") at 10:1-6.  They also argue that he signed

the "Guarantor" line as "President."  Pl. 56. 1 Counter ¶ 48.  But these assertions conflict with

the unambiguous terms of the Agreement, which clearly set forth a "Personal Guaranty," License

Agreement § 24, and contain a separate line signed by Glickman, *see id.* p. 7.  Therefore, these

assertions are not material to whether or not Glickman intended to be personally bound by the

guaranty.  *See HSBC Bank USA, Nat. Ass'n v. Goldberger*, 105 A.D.3d 906, 907 (2d Dep't 2013)

(concluding that assertions that defendant signed "only in his capacity as president of his

company, not in his individual capacity, and that the plaintiff" never told him he was "personally

guaranteeing any debt . . . were insufficient to raise a triable issue of fact as to whether [the

defendant] intended to be bound by the agreement in his individual capacity"); *see  In re

Tikijian*, 76 B.R. 304, 317 (Bankr. S.D.N.Y. 1987) (concluding "subjective intention" of

president and "addition of corporate title" near signature did not evidence clear intent not to be bound by personal guaranty where "language of the guarantees is express and clear" and states that corporate officer "will guarantee all of the obligations of the borrower"). As such, there are no material facts in dispute regarding whether Glickman intended to bound by the personal guaranty.

Perhaps recognizing this, Defendants primarily argue that the Amendment extinguished the personal guaranty. Defendants assert that because the Amendment to the Agreement did not include a clause for a personal guaranty, and because Glickman did not sign that Amendment in his personal capacity, he was no longer on the hook for the guaranty provision in the Agreement. *See* Def. Opp. at 12-13. Defendants are correct that "[u]nder New York law, liability created by a guaranty covering previously-existing debt or a particular transaction is extinguished if the time of payment is extended or the underlying agreement is altered in any way." *Flexi-Van Leasing, Inc. v. Isaias*, 23 F. Supp. 2d 419, 423 (S.D.N.Y. 1998) (citing *Becker v. Faber*, 280 N.Y. 146, 148-50 (1939)). But it is also the law that a "continuing guaranty . . . remains enforceable despite changes in the underlying agreement." *Id.* at 423. Here, the Personal Guaranty clause expressly includes a continuing obligation, stating: "Notwithstanding anything to the contrary contained herein, to the extent this Guaranty relates to the payment of sums due to [Body Glove] under the Agreement, it is a guaranty of payment and not of collection and a *continuing guaranty* that shall remain in full force and effect and be binding upon Guarantor until payment in full by [Exist] to [Body Glove] of all such sums due pursuant to or in connection with the Agreement." License Agreement § 24 (emphasis added). The Amendment changed the date that the Agreement ended, but it did not change the amount of payment, or address the personal guaranty provision. Indeed, the Amendment expressly provided, that

"[e]xcept as specifically amended and/or modified by this First Amendment, the License Agreement is hereby ratified and confirmed and all other terms of the License Agreement shall remain in full force and effect, unaltered and unchanged by this First Amendment."  Amendment § 7(e).  Reading these provisions together, it is clear that the Amendment did not modify the personal guaranty.  The Amendment dealt solely with the term of the contract, and not the amount of payment, relationship between the parties, or any personal guaranty.  *See generally* Amendment; *see also Movado Grp., Inc. v. Caseiko Trading Co.*, 912 F. Supp. 2d 109, 117 (S.D.N.Y. 2012) ("Moreover, the fact that Ben-Nissan did not guarantee the 2010 Stipulation of Payment Agreement is irrelevant, as again, this agreement dealt with a payment schedule rather than the obligations of each party under the original contract."); *see also LCA Leasing Corp. v. Borvig Corp.*, 826 F. Supp. 776, 780 (S.D.N.Y. 1993) ("Moreover, that agreement contains no provision releasing Schulz from his personal liability under LCA's letter agreement.").  Therefore, Defendants' argument that the Amendment somehow extinguished Glickman's personal guaranty is rejected.

Because there are no issues of material fact as to whether Glickman is liable on the personal guaranty, summary judgment in Body Glove's favor is appropriate unless there is a viable affirmative defense, which, as set forth below, there is not.

## II.     Defendants' Affirmative Defenses

Defendants raised 19 affirmative defenses in their answer to the Complaint, including failure to state a claim, lack of standing, and that the claims are barred by the following: agreements, Body Glove's prior breach, Body Glove's (and its other licensee's) acts or omissions, unclean hands, the doctrine of estoppel, the doctrine of waiver, the doctrine of laches, the statute of limitations, the Uniform Commercial Code ("UCC"), Body Glove's failure to act in

good faith, Defendants' good faith, public policy, failure to mitigate damages, the doctrine of setoff, and Body Glove's receipt of payment from the Other Licensee.  *See* Ans. at 9-11. "Summary judgment is also appropriate in the absence of material facts disputing a defendant's entitlement to judgment as a matter of law on an affirmative defense."  *Segen ex rel. KFx Inc. v. Westcliff Cap. Mgmt., LLC*, 299 F. Supp. 2d 262, 267 (S.D.N.Y. 2004).  Body Glove argues that Defendants have failed to offer evidence necessary to withstand summary judgment on their affirmative defenses, entitling Body Glove to summary judgment on both of its claims.  Pl. Br. at 7-13.  Many of Defendants' affirmative defenses overlap with their arguments that Body Glove did not perform its obligations under the contract.  *See supra* Section I(A).  Therefore, while the Court will address each affirmative defense, it will reference the Court's prior analysis where appropriate.

Although characterized as numerous affirmative defenses, Defendants' brief makes clear that Defendants' first, fifth, sixth, seventh, and nineteenth affirmative defenses are all premised upon Defendants' claim that Body Glove breached the contract by its acts and omissions vis-à-vis Exist and its Other Licensee.  *See* Def. Opp. at 15-16.[4]  For the reasons set forth below, *see supra* Section I(A), Defendants have failed to offer evidence that Body Glove breached the Agreement, and as such, Defendants' first, fifth, sixth, seventh, and nineteenth affirmative defenses are dismissed.

---

[4] The first affirmative defense is for failure to state a claim; the fifth affirmative defense is that Body Glove's claims are barred by its breach; the sixth affirmative defense is that Body Glove's claims are barred by its acts and omissions; the seventh affirmative defense is that Body Glove's claims are barred by its other licensee's acts and omissions; and the nineteenth affirmative defense is that Body Glove's claims are barred by its receipt of payment from the other licensees. *See* Ans. at pp. 9-11.

Defendants' fourteenth affirmative defense is that Body Glove did not act in good faith, and its fifteenth affirmative defense is that Defendants, in contrast, did act in good faith. *See* Ans. at p. 11. Defendants' only argument in their papers regarding good faith is that Body Glove breached the implied covenant of good faith and fair dealing when it did not include Exist at their booths at trade shows. This defense is dismissed for the same reasons that their counterclaim on this basis is dismissed. *See infra* Section III(B).

Defendants' thirteenth affirmative defense is that that Body Glove's claims are barred by the UCC. *See* Ans. at 10. Defendants initially failed to specify the section of the UCC that allegedly bars Body Glove's claims. *See* Pl. Br. at 11. In their opposition to Body Glove's motion for summary judgment, Defendants for the first time argue that Section 2-306(2) of the UCC bars Body Glove's claims because it did not use "best efforts" to help Exist. Def. Opp. at 20. Section 2-306(2) of the UCC provides that "[a] lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale." N.Y. U.C.C. § 2-306(2). Defendants have not offered evidence demonstrating that this is a proper basis for an affirmative defense, or that this section of the UCC applies to the Agreement on the facts asserted here. Nevertheless, even assuming this provision applies, it would require *Exist*, the buyer as licensee of the trademark, to use "best efforts to promote [the] sale" of the trademarked goods – not Body Glove. There is therefore no basis under Section 2-306(2) of the UCC for Defendants' affirmative defense.

Defendants raise the doctrine of estoppel as their ninth affirmative defense. *See* Ans. at p. 10. "Under New York law, equitable estoppel requires a showing of (1) [a]n act constituting a concealment of facts or a false misrepresentation; (2) [a]n intention or expectation that such acts

will be relied upon; (3) [a]ctual or constructive knowledge of the true facts by the wrongdoer; (4) [r]eliance upon the misrepresentations which causes the innocent party to change its position to its substantial detriment." *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 714 (S.D.N.Y. 2012) (internal citation and quotation marks omitted).  Defendants argue that their motion papers evince "numerous acts that amount to false representations and concealment" on the part of Body Glove, including specifically Body Glove's conduct with regard to the Other Licensee.  Def. Opp. at 16.  But Defendants have not pointed to any facts or evidence showing that Body Glove *concealed* its activity with the Other Licensee; to the contrary, the evidence shows that the parties openly discussed the potential overlap between the licenses.  *See, e.g.*, Sealed July 21, 2017 Correspondence (acknowledging that Body Glove was going to compare distribution lists between Exist and Other Licensee); Sealed July 23, 2017 Correspondence (informing Body Glove that there is "some confusion in the marketplace" regarding the short form license); Sealed Aug. 2017 Correspondence ("From my perspective, there continues to be products that fall under both licensee's [sic] grant and I fear both licensee's [sic] will be selling very similar product  . . . .").  Therefore, Defendants were on notice of the Other Licensee, and Defendants have not offered any evidence of the remaining three elements required for estoppel.  Accordingly, the ninth affirmative defense fails.

Defendants' tenth affirmative defense of waiver is also dismissed.  *See* Ans. at p. 10.  "The affirmative defense of waiver applies only if the plaintiff intentionally and knowingly waived its right to recovery." *Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 310 (S.D.N.Y. 2010) (citation and quotations omitted).  A contractual right may be waived if it is "knowingly, voluntarily and intentionally abandoned." *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015).  Defendants

argue that Body Glove waived its contract claim by executing the Amendment.  *See* Def. Opp. at 17-18.  However, the Amendment merely extended the time by which Defendants were obligated to pay Body Glove; it did not release them from their obligation to pay.  *See generally* Amendment.  Defendants concede that the outstanding GMR ($225,000) has not been paid, which was contemplated under both the Agreement and Amendment.  *See* Def. 56.1 Counter ¶ 71.  Accordingly, Defendants' affirmative defense of waiver clearly fails.

Defendants' eleventh affirmative defense is based on the doctrine of laches.  *See* Ans. at p. 10.  "Laches bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant."  *Maxim Grp. LLC*, 690 F. Supp. 2d at 310 (internal quotation marks and citation omitted).  "Laches cannot be a defense to a legal action for damages if the action was commenced within the statute of limitations period." *Id.*  Defendants argue that Body Glove's claims are barred by laches because "Body Glove had the ability to terminate the agreement and immediately bring suit but chose not to do so."  Def. Opp. at 18.  This contention does not support a claim of  laches.  Body Glove's lawsuit was filed roughly two years after Exist's admitted last payment and is timely under the statute of limitations.  Defendants have also not shown how the filing date of this lawsuit unduly prejudiced Defendants.  This defense therefore fails.

Defendants' seventeenth affirmative defense is for failure to mitigate damages.  *See* Ans. at p. 11.  "Failure to mitigate damages is an affirmative defense to a breach of contract claim, which requires the defendant to establish not only that the plaintiff unreasonably failed to mitigate, but that reasonable efforts would have reduced the damages."  *Mohegan Lake Motors, Inc. v. Maoli*, 559 F. Supp. 3d 323, 346 (S.D.N.Y. 2021) (internal citations and quotations omitted).  Defendants argue that Body Glove failed to mitigate damages by not terminating the

contract or suing earlier.  *See* Def. Opp. at 18-19.  But the damages sought here are a set amount: the remainder of the GMR.  *See* Def. 56.1 Counter ¶¶ 70-71.  Whether Body Glove sued immediately for those arrears or two years after the payment was due would not have changed the amount of damages at issue here.

Defendants also argue that the GMR is not a liquidated damages provision that would preclude Defendants from asserting an affirmative defense for failure to mitigate.  Def. Opp. at 18-19.  However, case law in this District supports the theory that the GMR is akin to a permissible liquidated damages provision.  *See Oscar de la Renta, Ltd. v. Mulberry Thai Silks, Inc.*, No. 08-cv-04341 (RJS), 2009 WL 1054830, at *6 (S.D.N.Y. Apr. 17, 2009) ("The amount due in liquidated damages is simply the sum of the minimum royalties due under the contract for the unexpired term of the contract at the time of the breach, as well as any royalty monies then due and owing."); *see also Glob. Brand Holdings, LLC v. Accessories Direct Int'l USA, Inc.*, No. 17-cv-7137 (LAK) (HBP), 2019 WL 3711767, at *8 (S.D.N.Y. July 31, 2019) (noting that "defendant could not claim that the liquidated damages provision is unreasonably disproportionate to plaintiff's probable loss because, as plaintiff notes . . . the GMR payments that plaintiff claims as liquidated damages are calculated based on a five percent royalty of defendant's projected minimum sales" (emphasis omitted).  Defendants fail to satisfy the elements of this affirmative defense.

Defendants' eighteenth affirmative defense is for "setoff."  Ans. at p. 11.  They argue that Body Glove's fees from the Other Licensee should be "set off" from the damages asserted here because the licenses overlapped.  *See* Def. Opp. at 19.  Defendants fail to provide legal authority for this theory or assert where any setoff authority arises in the contract, particularly in light of the contractual provision affording Body Glove the "sole discretion" to resolve disputes between

licensees.  *See supra* Section I(A)(1).  More importantly, the damages at issue – the GMR – was due and owed to Body Glove regardless of whether or not Body Glove entered into other contracts.  *See Willett v. Lincolnshire Mgmt., Inc.*, 302 A.D.2d 271 (1st Dep't 2003) ("[T]here is no right to set off a possible, unliquidated liability against a liquidated claim that is due and payable.") (citation and quotations omitted).  Accordingly, the Court concludes that this affirmative defense fails as a matter of law.

Finally, Defendants' sixteenth affirmative defense is that Body Glove's claims are barred by public policy.  *See* Ans. at p. 11.  In their opposition to Body Glove's motion for summary judgment, Defendants for the first time explain the basis for this affirmative defense:  that the provision giving Body Glove "sole discretion" to resolve disputes regarding the scope of the Licensed Products is contrary to New York's public policy, and therefore bars Body Glove's claims.  Def. Opp. at 20-21.  Contrary to Defendants' view, however, New York courts have upheld provisions that permit a licensor to resolve disputes regarding the scope of two arguably conflicting exclusive license agreements.  *See Innovative Concepts & Design, LLC*, 202 A.D.3d at 596.

The only case Defendants cite in support of their contention that Body Glove's right to determine the scope of products between its licensees violates New York public policy is *Cross & Brown Co. v. Nelson*, 4 A.D.2d 501, 50 (1st Dep't 1957).  In *Cross & Brown*, the employment agreement between the parties stated that any disputes under the contract shall be submitted to arbitration and the arbitrator, with final authority, was designated as the Board of Directors of the employer.  *Id.* at 501.  The court held that arbitration is an adjudicatory method that is meant to "substitute for the usual processes provided by law" upon the consent of the parties.  *Id.* at 502. The court found a public policy violation because a party cannot act in a "judicial or quasi-

judicial capacity" in their own controversy.  *Id.  Cross & Brown* is inapposite here.  This case

does not involve an agreement to arbitrate or the designation of one or other of the parties, or

their representatives, as arbiters.  Indeed, the parties are presently before this judicial body to

resolve their dispute.  Even if the Court were to extrapolate from *Cross & Brown* in the manner

Defendants suggest, the Agreement also does not provide that all breaches or disputes would be

resolved by a party to that contract.  Instead, the Agreement affords Body Glove sole discretion

to resolve certain issues under the Agreement, including disagreements regarding the products

covered by its multiple licensees.  Trademark owners are required to police their marks, and New

York law generally permits a contract to provide sole discretion to one party, so long as the

discretion is not exercised "arbitrarily or irrationally."  *See, e.g.*, *Miller*, 527 F. Supp. 3d at 500.

The Court therefore concludes that Defendants' sixteenth affirmative defense fails as a matter of

law.[5]

Given that Body Glove has established that there are no genuine issues of material fact

with respect to its two claims and all of Defendants' affirmative defenses fail, Body Glove has

established that it is entitled to summary judgment on its claims.

## III.     Exist's Counterclaims

---

[5] Defendants also pleaded affirmative defenses that Body Glove's claims are barred by the
License Agreement and Amendment to the License Agreement.  *See* Ans. at pp. 9-10 (third and
fourth affirmative defenses).  Body Glove moved for summary judgment on these defenses.  *See*
Pl. Br. at 9.  Defendants do not respond to Body Glove's motion with respect to the third and
fourth affirmative defenses.  Defendants also indicate that they withdraw their second, eighth,
and twelfth affirmative defenses.  *See* Def. Opp. at 14 n.5.  Therefore, the Court concludes that
Defendants have either withdrawn or waived their second, third, fourth, eighth, and twelfth
affirmative defenses.  *See, e.g.*, *Ferdman v. CBS Interactive Inc.*, 342 F. Supp. 3d 515, 543
(S.D.N.Y. 2018) (concluding affirmative defenses abandoned where defendants failed to respond
to plaintiff's arguments about them, and there was no evidence in record in support of them).

Defendants move for summary judgment on their counterclaims for breach of contract and breach of the implied duty of good faith and fair dealing.  *See* Def. Br. at 14-23.  Body Glove argues that the evidence does not support Defendants' counterclaims, and Body Glove is also entitled to summary judgment with regard to its affirmative defenses to those counterclaims.  Pl. Br. at 13-22.

### A.  Counterclaim 1:  Breach of Contract by Body Glove

Exist's first counterclaim is that Body Glove breached the Agreement and Amendment. This counterclaim fails because, as the Court explained at length, *supra* Section I(A)(1)-(4), Defendants have not established that Body Glove breached the Agreement.

### B.  Counterclaim 2:  Breach of Implied Covenant of Good Faith and Fair Dealing by Body Glove

Exist's second counterclaim is that Body Glove breached the implied covenant of good faith and fair dealing.  Generally speaking, all contracts under New York law include an implied covenant of good faith and fair dealing.  *See Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011).  "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Id.* (quoting *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002)).  Therefore, where a party must exercise some discretion under the terms of an agreement, "this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion.  *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995).  Additionally, "[t]he covenant incorporates any promises which a reasonable person in the position of the promisee would be justified in understanding were included . . . ."  *Roberts v. Weight Watchers Int'l, Inc.*, 217 F. Supp. 3d 742, 751-52 (S.D.N.Y. 2016) (citation and internal quotation marks omitted). Nevertheless, the "covenant of good faith cannot be used to impose obligations that were not

explicitly part of the agreement"; in fact, the covenant of good faith only imposes obligations

that are "derivative of its contractual obligations."  *Levion v. Societe Generale*, 822 F. Supp. 2d

390, 404 (S.D.N.Y. 2011).  The implied covenant of good faith and fair dealing "cannot add to,

detract from, or alter the terms of the contract itself."  *Roberts*, 217 F. Supp. 3d at 752 (citation

and quotations omitted).

Here, Defendants allege that Body Glove breached the covenant of good faith and fair

dealing when it permitted the Other Licensee, and every other Body Glove licensee, to use its

booth at trade shows, but did not permit Exist to do so.  *See* Ans. at p. 20.[6]  Exist contends that

customers therefore believed that Exist was not selling licensed Body Glove products, depriving

Exist of the benefits under the Agreement.  *See* Def. Br. at 23.  Body Glove responds that not

every other licensee sold out of Body Glove's booth, but that in any event, it had no obligation

under the Agreement to provide Exist a spot at its booth, and the covenant of implied good faith

and fair dealing cannot read that obligation into the contract.  *See* Pl. Br. at 19-20; Pl. Opp. at 16-

17.

The Court agrees with Body Glove that Defendants' theory of breach here would

impermissibly expand the terms of the Agreement.  The Agreement undisputedly does not

contain any provision guaranteeing that Exist would be granted a place in Body Glove's

---

[6] In its Answer, Exist alleges that Body Glove breached the implied covenant by "requiring Exist to use the Altered Mark" and "by hosting and/or inviting other licensees, but not Exist, to trade shows where those licensees had access to potential purchasers . . . ."  Ans. at p. 20.  The Court previously dismissed the former basis for this counterclaim as duplicative of the breach of contract counterclaim.  *See* ECF No. 25; *see also PNC Bank, Nat'l Ass'n v. Wolters Kluwer Fin. Servs., Inc.*, 73 F. Supp. 3d 358, 370 (S.D.N.Y. 2014) (stating New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled).  Nevertheless, as stated *supra* Section I(A)(3), there is no evidence that Body Glove acted arbitrarily or irrationally with respect to the hangtags.

tradeshow booths and Exist's allegation that Body Glove promised it would have such a place prior to the execution of the Agreement is expressly foreclosed by the Agreement's integration clause. *See* Agreement § 25; *see generally* Agreement. The Court is further unaware of, and Exist has not pointed to, any provision of the Agreement from which an obligation to include all licensees in its booth at a trade show would be implied. Nor does Exist allege that its right to sell at Body Glove's booth is otherwise derivative of some marketing or promotional obligation on the part of Body Glove in the Agreement.

*Global Brand Holdings, LLC v. Accessories Direct Int'l USA, Inc.* is instructive. In *Global Brand Holdings*, the defendant licensee asserted a counterclaim for breach of the covenant of good faith and fair dealing, alleging that the plaintiff licensor had sold licensor's products at "lower-tier retailers," did not help sell the products at "better stores," and did not include defendant's products on the plaintiff's marketing channels. 2019 WL 3711767 at *8-9. The court concluded that the plaintiff's "only obligation pursuant to the License Agreement was to allow defendant to use the . . . trademark." *Id.* at *9. The court found that the "License Agreement here [did] not imply the obligations that defendant alleges plaintiff failed to fulfill" in part because "express terms of the License Agreement required defendant – not plaintiff – to use its best efforts in the advertising, promoting, selling, distributing and in all other dealing with or disposal of the Licensed Products . . . ." *Id.* at *10 (internal citations and quotation marks omitted). Nothing in the license "required plaintiff to do anything to assist defendant in advertising or selling its [trademark]-branded products." *Id.* at *10. To imply an obligation to assist the defendant with its marketing, even under the implied covenant of good faith and fair dealing, would in effect impermissibly "reallocate duties expressly addressed in the contract." *Id.*

Similarly, here, even if Body Glove permitted every licensee other than Exist to sell from Body Glove's trade show booths, which Body Glove disputes, there is no provision in the Agreement requiring Body Glove to assist with marketing efforts or to promote Exist's Body Glove trademarked products. *See generally* Agreement. Rather, as in *Global Brand Holdings*, the Agreement provided that *Exist*, rather than Body Glove, "represents and warrants" that it will "use commercially reasonable efforts to promote, advertise, market and sell the Products at all Approved Customers in the Territory . . . ." License Agreement § 22. Exist's argument that Body Glove has an implied obligation to allow Exist to promote and sell its products in the Body Glove trade show booths would therefore reallocate the duties that are expressly addressed in the contract.

The Amendment further undermines Exist's claim. In the Amendment, entered into by the parties on August 27, 2018, Body Glove "agree[d] *to discuss the possibility* of Licensee inclusion in Licensor's booth at Surf Expo and other relevant trade shows as they arise." Amendment § 7(b) (emphasis added). This addition demonstrates that the parties understood that trade show placement was not within the scope of the original Agreement and provided a new obligation that the parties would "discuss" such placements. Therefore, even under the Amendment, there was no agreement that Exist would be included in the Body Glove booths, only that it would be discussed. The parties agree there was one trade show that occurred after the Amendment was signed in 2018 where Body Glove did not invite Exist to join its booth, and Defendants have presented no evidence that Body Glove acted in bad faith or arbitrarily with respect to discussions regarding that show. Rather, Body Glove told Exist it was "likely [to] have a challenge for resort wear in the space we have" so it made "the most sense to have Exist display in the resort section of the show[.]" Pl. 56.1 Counter ¶ 90 (quoting ECF No. 35-21).

Exist has not presented evidence that Body Glove did not discuss including Exist in its booth for the 2018 show, that the discussion was conducted in bad faith, or that Body Glove acted arbitrarily given Body Glove's logistical space concerns articulated above.

Accordingly, Defendants' counterclaim for breach of the covenant of good faith and fair dealing fails as a matter of law.

## IV.    Body Glove's Affirmative Defenses

Defendants largely fail to address Body Glove's affirmative defenses in their motion for summary judgment, and only address the affirmative defenses of waiver, estoppel, and legitimate business purpose in their reply papers in support of their motion for summary judgment, *see* Def. Reply at 9-10, and in opposition to Body Glove's motion for summary judgment, *see* Def. Opp. at 23-25.  In any event, because the Court has concluded that Defendants' counterclaims fail as a matter of law, it need not address Body Glove's affirmative defenses with respect to those counterclaims.

## CONCLUSION

For the foregoing reasons, Body Glove is entitled to summary judgment on its breach of contract and breach of the personal guaranty claims, and Defendants are jointly and severally liable for damages in the sum of $225,000.  Defendants' counterclaims are dismissed.

IT IS HEREBY ORDERED that this Opinion and Order shall be temporarily filed under seal so that the parties may review the decision and propose redactions.  IT IS FURTHER ORDERED that the parties shall file joint proposed redactions within 30 days of the date of this Opinion and Order.  The proposals shall be made in accordance with the Court's Individual Rule 4 and the Local Rules.  Any opposition to the proposed redactions shall be filed within seven days of the request.

The Clerk is respectfully directed to enter judgment in favor of Plaintiff and CLOSE this case.

Dated:  March 31, 2023
        New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge